GURDON BUCK *v.* FRANCIS H. AMIDON.

It is a general principle of the law of agency, that one who procures services to be done for another is not himself chargeable as the debtor, unless he omits to make known his principal, or erroneously supposes that he has authority, or exceeds his authority, or expressly or impliedly engages to be answerable, either by distinctly promising to pay for them if rendered, or by doing or saying something which justifies the person who is to perform them, in supposing that that the one who applies to him engages to pay therefor.

Upon the question as to whom the plaintiff gives credit, where one person orders him to do work for another, the circumstance as to whom the plaintiff charges the work on his books, and to whom he makes out his bill, is most material, and unexplained, is controlling.

Where, upon an uncontradicted state of facts, the point involved remains doubtful or upon undisputed facts, inferences may be drawn either way, the question is properly one for the jury, and their finding should be conclusive. But in all

such cases, there must be something in the evidence on which to found the conclusion, and whether there is or not is a question of law.

APPEAL by defendant from a judgment of the general term of the Marine Court, affirming a judgment entered on the verdict of a jury at trial term.

The action was brought to recover the value of services rendered by the plaintiff as a physician and surgeon, bestowed upon J. C. Amidon, the defendant's brother, at the special instance and request of the defendant. The facts are stated in the opinion.

The jury rendered a verdict for the plaintiff, on which judgment was entered.

The defendant appealed to this court.

*Ira D. Warren*, for appellant.

I. There being no conflict of evidence, the defendant's liability is a question of law (*Pratt* v. *Foot*, 9 N. Y. 465).

II. The facts show that no credit was given to the defendant, and that he acted as a mere agent (2 Kent's Com. 630; 1 American Leading Cases, 614; Smith's Mercantile Law, 144, sec. 7; *Owen* v. *Gooch*, 2 Esp. 567; Dunlap's Paley on Agency, 369, 370, cases cited in note (*d.*); Story on Agency, § 261, § 289, note; *Costigan* v. *Newland*, 12 Barb. 458; *Stanton* v. *Camp*, 4 Id. 278; *Dana* v. *Monro*, 38 Id. 528; *Colvin* v. *Holbrook*, 2 N. Y. 126).

*Matthews & Betts*, for respondent.

I. The question in this case being as to the intention of the parties as deduced from the facts and circumstances of the case, was properly submitted to the jury, and their verdict will not be disturbed (*Dannell* v. *Pratt*, 2 Carr. & P. 82; *Leggatt* v. *Reed*, 1 Id. 15; *Hayward* v. *Fiott*, 8 Id. 59; *McCaffil* v. *Radcliffe*, 3 Robt. 445; *Cross* v. *Williams*, 7 Hurl. & N. Ex. 673; *Williamson* v. *Barton*, Id. 899; *Miller* v. *Eagle Life and Health Ins. Co.* 2 E. D. Smith, 287; *Taylor* v. *Allen*, 36 Barb. 294;

Buck v. Amidon.

*Fero* v. *Buffalo & S. L. R. R. Co.* 22 N. Y. 209 ; *Tuttle* v. *Buck*, 41 Barb. 417 ; *McClune* v. *Cain*, 3 Abb. Ct. App. Dec. ; 2 Keyes, 203 ; *McCaffil* v. *Radcliffe*, 3 Robt. 435).

II. A party who would excuse himself from responsibility on the ground that he acted as an agent of another ought to show that he had done sufficient to charge his principal (*Sewall* v. *Fitch*, 8 Cow. 215 ; *Mauri* v. *Heffernan*, 13 Johns. 57). In the case of an agent acting for a foreign principal, as in this case, the strong presumption is that the credit is given exclusively to the agent (Story on Agency, § 270).

By THE COURT.*—DALY, CH. J.—There is no conflict in respect to the facts in this case. There may be some little variation or difference between Dr. Buck and the defendant's account of what occurred between them, but nothing that could materially affect the case. It is only that difference ordinarily found between two persons in narrating the same transaction, but not any difference as to the facts, which, as narrated by both, are substantially the same.

The defendant's brother, J. C. Amidon, who was a resident of Groton, in Connecticut, had an affection of the bladder, for which he was attended by a Dr. Francis, of New London, and whilst the doctor was engaged in drawing the patient's water by means of a catheter, the cap or button of the instrument broke off and the catheter passed into the bladder—a very unusual circumstance—and which involved the necessity of a very delicate and skilful operation to extract the catheter. The family was alarmed at the accident, and requested the doctor to send to New York for a surgeon, by telegraph, and "to make the thing sure," to send the dispatch to the patient's brother, F. H. Amidon, the defendant, as "he would be sure to deliver it." Dr. Francis accordingly sent a dispatch to the defendant in these words : " New London, Nov. 20, 1869, 2 P. M. To Francis Amidon, 649 Broadway, N. Y. Don't fail to come and bring a surgeon to-night. GURDON BUCK, M. D., 121 Tenth street. Please come immediately. Elastic catheter

---

* Present, DALY, Ch. J., LARREMORE and J. F. DALY, JJ.

lost in the bladder of patient, possibly also stone. If you cannot come, please direct to the most suitable surgeon. Dr. Francis. Please answer, but don't fail to come with a surgeon." It was a dispatch alike to the defendant and to Dr. Buck, or, as Dr. Francis testified, he sent two dispatches, which were probably united in one.

Immediately upon receiving the dispatch, the defendant went to the residence of Dr. Buck, the plaintiff, who is an eminent surgeon in this city, and told him that he had received a telegram from his brother's physician, requesting him to bring up a surgeon that night to relieve his brother, living opposite New London (Groton), who had got a catheter in his bladder, and taking out the dispatch he read it to the plaintiff. He asked the plaintiff if he knew Dr. Francis, his brother's physician, and the other said, "No, but that he may have met him;" upon which the defendant replied that he must have heard of some operation of his, from his inviting the defendant to call upon him; to which the plaintiff answered that he was somewhat known as a surgeon. The defendant then said, "The question is, can you go;" and the plaintiff, after some hesitation, said, "Yes." The defendant then advised him that there was a train that evening at 8 p. m.; that if he could go, the defendant would go with him, and it was arranged that they should meet at the depot. The defendant then went away, and apprehending that there might be some misunderstanding, returned and left the telegram with the plaintiff, in order, as he said, that he might understand Dr. Francis better than he did, and they exchanged a few words confirming the appointment for the evening train at 8 o'clock. Nothing was said about who was to pay the plaintiff. The defendant testified that he did not consider that he had any discretion in the matter, and the plaintiff testified that when the dispatch was left with him, he took it to the light in his office, and seeing that it was addressed to F. H. Amidon, he referred to the directory, and finding, he said, that the person who called upon him was Mr. Amidon, the hatter, he took it for granted that he was dealing with a responsible party.

The plaintiff and the defendant met, pursuant to the appoint-

ment, in the evening, at the depot and went up together to Groton, the defendant paying Dr. Buck's fare. Upon the doctor's arrival at three o'clock in the morning, he examined the patient, and during the day the operation, which is elaborately detailed in the evidence, was successfully and very skilfully performed by him, to the great relief of the patient and to the satisfaction of the attending physician, and of all parties.

The plaintiff testified that he noticed that the patient was living upon a moderate scale, and that he was taken by surprise to be sent for so far by a man living apparently upon a moderate scale; that he considered that people in straitened circumstances do not send to distant cities for eminent medical service unless they are able to pay for it, or unless they have friends who can, and that he took into consideration that New England people should not be taken by their appearance, and knew that the patient had kind friends who could be responsible for extra medical services.

Upon the evening of the day of the operation, and shortly before the departure of the plaintiff, the defendant's brother sent for him and requested him to ask the doctor for his bill, which the defendant accordingly did. The plaintiff replied that it did not matter about presenting a bill then, and gave the defendant a piece of paper, with these words written upon it, " Dr. Buck, 46 West 29th street, $400." The defendant then went into his brother's room, told him what the doctor's bill was, and he expressed great surprise. The defendant returned and told the doctor that his brother thought that it was a very large bill, and that he must remember that his brother was not a rich man, and the doctor answered that he supposed the people who could send for a surgeon that distance were rich, or, as the plaintiff testified, he replied that he had taken that into consideration ; that he was not accustomed to go away and render services except upon such terms; that he had rendered a very important service, and saved the patient from a very serious operation which would have been necessary, if the plaintiff had not succeeded as he did ; which was the first occasion upon which anything had passed between the defendant and the doctor upon the subject of his remuneration.

The doctor then left, and eight days afterward, he sent a bill to the defendant, in which the patient was named as the debtor. It was in these words, "New York, Nov. 29, 1869. Mr. J. C. Amidon, Groton, Conn., to Dr. Gurdon Buck, *Dr.*, No. 46 West 29th street. To professional services, surgical operation, at Groton, Conn., &c., &c. $400;" which the plaintiff says he sent to the defendant, as he supposed that the brother in New York was the proper *channel* to send the bill to; and, on the 4th of December following, the plaintiff sent to the patient the following letter : "Mr. J. C. Amidon, Groton, Conn. Dear Sir: After waiting a reasonable time without hearing *from you,* I beg leave to remind you that it is customary to settle such accounts as mine, for professional services rendered at a distance, promptly. Hoping it will receive your early attention, I remain, &c., &c."

This letter was followed by letters between the plaintiff and Dr. Francis, of New London, and by a letter from the patient, and a note from the defendant, as indicated in the following letter which the plaintiff addressed to the patient on the 14th of December, 1869 : "Mr. J. C. Amidon. Dear Sir: I beg to acknowledge your favor of the 9th instant, and to inform you that your brother addressed me a note yesterday, offering me one hundred and fifty dollars in settlement of my bill for professional services. I wrote Dr. Francis in reply to a letter received from him last week, and in consideration of explanations made by him, I expressed my willingness to make a concession of $100 in settlement of my bill. I desired him to communicate the contents of my letter to you, and supposing him to have done so, I received *your* last proposal with no little surprise. I am not disposed to conform my terms to *your* ideas of liberal remuneration, and have not been accustomed, after rendering important services, especially at a distance, *to submit* to conditions the design of which seems to be, to determine how little may be got off with. I shall still adhere to my terms of $300, and hope there may be no further delay in settling. Very respectfully, &c., &c."

The plaintiff testified that $500 would have been his charge but for the circumstances in which he found the defendant's

brother living, and two eminent surgeons, Drs. Parker and Van Buren, testified that $500 would have been a reasonable charge. Upon this state of facts, the judge left it to the jury to determine who employed the plaintiff, or upon whose account and credit the services were rendered, and the jury found a verdict for the plaintiff for $400.

It is suggested, in answer to the defendant's appeal, that the question to whom the credit was given, was one of the intention of the parties as deduced from the facts and circumstances, and that the jury, having drawn the deduction that the services were rendered upon the credit of the defendant, their verdict should not be disturbed. Where, upon an uncontradicted state of facts, the point involved remains doubtful, or upon undisputed facts, inferences may be drawn either way, the question is properly one for the jury, and their finding should be conclusive. In all such cases the unanimous concurrence of the twelve minds in the jury box, is as satisfactory a mode of reaching a right conclusion, as to attempt to work it out by legal deductions or logical reasoning. But in all such cases there must be something in the evidence to found the conclusion upon, and in this case I fail to discover anything showing, or tending to show, that the defendant ever did or said anything to warrant the plaintiff in assuming, before he went to Groton, and before he performed the operation, that the defendant was to pay him for his services. It would be preposterous to say that a person who brings a message to a surgeon from the attending physician of a patient, requesting him to come and perform an operation upon the patient, is, by the mere delivery of such a message, chargeable with the obligation of paying the surgeon for his services. He is a mere agent, and nothing more, unless he communicates the message in such a way, or does, or says something that fairly warrants the surgeon, before he undertakes the service, in supposing that he is the person who is to pay for it, and in this respect it can make no difference that the bearer of the message happens to be a brother of the patient.

It is a general principle pervading the law of agency, that one who procures services to be done for another is not himself

chargeable as the debtor, unless he omits to make known his principal, or erroneously supposes that he has authority, or exceeds his authority, or expressly or impliedly engages to be answerable, either by directly promising to pay for them if rendered; or, by doing or saying something which justifies the person who is to perform them in supposing that the one who applies to him engages to pay for them. The law is too well settled in this respect to make it necessary to refer to authorities, and the direct application of it to the facts now before us may be illustrated by the case to which the appellant has called our attention (*Owen* v. *Gooch*, 2 Esp. 567). The plaintiff, in that case, was a paper hanger, and the defendant gave him an order for paper and work to be done in the way of his business in the house of one Tippel, the plaintiff being informed, when the order was given, that the work was on Tippel's account, and the entry upon the plaintiff's book being " Mr. Tippel, by order of Gooch." It was argued in that case, as it is in this, that the person for whom the work was done may have been unknown to the plaintiff; but the defendant Gooch was known to him, and that, under such circumstances, the work must be deemed to have been ordered on his credit, and that he was consequently liable. The answer of Lord Kenyon may be quoted as pertinent, in its general bearing to the present case. He said, " If the mere act of ordering goods was to make the party who ordered them liable, no man could give an order for a friend in the country, who might request him to do it, without risk to himself. If a party orders goods from a tradesman, though, in fact, they are for another, if the tradesman is not informed at the time that they were for the use of another, he who ordered them is certainly liable, for the tradesman must be presumed to have looked to his credit only. * * * But, wherever an order is given by one person for another, and he informs the tradesman who the person is for whose use the goods are ordered, he thereby declares himself to be merely an agent, and there is no foundation for holding him to be liable."

In the present case, the defendant exhibited to and left with the plaintiff the dispatch he had received, and the plaintiff admitted, upon the trial, that the defendant told him that the

patient therein referred to was his brother. He was, therefore, informed beforehand of the person upon whom the operation was to be performed, and the argument of the plaintiff's counsel, upon the appeal, that the plaintiff "knew nothing about the defendant's brother, not even his name, made no inquiries about him or his responsibility, and hence could not have contracted for his services upon his credit," is sufficiently answered by the remarks above quoted from Lord Kenyon. This is all the defendant did, except to pay the plaintiff's fare to New London; but this was after the doctor had come to the railroad prepared to go Groton and perform the operation, and was in itself too slight a circumstance upon which to found an implied engagement to pay the plaintiff for his services.

But the case is not only destitute of any act upon the part of the defendant which would justify the plaintiff in assuming, when he consented to go, that the defendant was to pay him; but his own acts, then and subsequently, show that it was the patient, and not the defendant, that he looked to for the payment of his bill. Before leaving, he consulted the directory, and found that the person who called upon him was Mr. Amidon, the hatter, when, he says, he took it for granted that he was dealing with a responsible party; but that the one whom he took it for granted was a responsible party, was the patient upon whom he was to perform the operation, is shown by his own statement, upon the trial, that when he reached Groton he "was taken rather by surprise to have been sent for so far by a man living upon a moderate scale," but took into consideration that "New England people should not be taken by their appearance," a presumption in the application of which he may still be right, for there is nothing in the case to show that the defendant's brother was not a responsible person, and able to pay the amount which the plaintiff claimed. All that the case shows is that he complained that it was too large, and that he offered through his brother to pay a smaller sum.

All the plaintiff's subsequent acts, like the preceding, show that it was to the person upon whom the operation was performed, that he looked for the payment of his bill. He made it out to him and sent it to the brother here in New York, because, to use his own words, he supposed that he was "the proper

channel to send it to." That he considered the defendant simply as a "channel" through which to send the bill to the debtor, is shown by the fact that after eight days had elapsed, without its being paid, he sent a letter, not to the defendant, but to the patient, and advised him that he had waited a reasonable time without hearing *from him*, and in the next letter, of December 14th, he writes to the patient: "I received *your* last proposal (the $150) with no little surprise. I am not disposed to conform my terms to *your ideas*," and ends by hoping that there may be no further delay in settling. All this conclusively shows to whom the credit was given, and by whom, from the beginning, he supposed he was to be paid.

In the question which arises so frequently under the statute of frauds, to whom was the credit given, in cases where the point is whether the promise was collateral to answer in default of another or was an original undertaking, just weight is attached to the fact that the plaintiff has charged the defendant upon his books or made out the bill to the person who received the goods, to show that the promise of the defendant was simply a collateral, and therefore void for not being in writing (*Anderson* v. *Hayman*, 1 H. Black. 121; *Dixon* v. *Frazee*, 1 E. D. Smith, 34; *Larson* v. *Wyman*, 14 Wend. 246; Browne on Statute of Frauds, § 198). It is not absolutely conclusive, as it may be shown that it was done by mistake (*Loomis* v. *Smith*, 17 Conn. 115); but it is a most material, and, without explanation, a controlling circumstance; for, as my former colleague, Judge Woodruff remarked, in *Dixon* v. *Frazee* (*supra*), the plaintiff thereby puts his own construction upon the agreement. Such was the case here. The plaintiff made out his bill against the defendant's brother, and nothing appearing to show that this was done by mistake or any explanation given why he did so, the same construction would be given to so material a circumstance as was given in the cases above quoted; so that even if the defendant had promised to pay the plaintiff, the undertaking would be collateral, and void under the statute, not being in writing. After going carefully over the evidence, I can find nothing in it to support the verdict, and, in my judgment, it should be set aside.

Judgment reversed.